**TRULY NOLEN, Inc. v. ORKIN EXTERMINATING COMPANY OF SOUTH FLORIDA, Inc., et al.**

**No. 58C 7723.**

Circuit Court, Dade County.

December 11, 1958.

Bernard B. Weksler and Joseph Pardo, both of Miami, for plaintiff.

John H. Wahl, Jr., Walton, Lantaff, Schroeder, Atkins, Carson & Wahl, Miami, for defendants.

PAT CANNON, Circuit Judge.

This cause is before the court on the complaint of Truly Nolen, Inc. (hereinafter referred to as "Nolen") and the answers of the corporate defendants Orkin Exterminating Company of South Florida, Inc. and Orkin Exterminating Company of Florida, Inc. (hereinafter referred to collectively as "Orkin") and the individual defendants Taft Pierce and Albert Snyder.

The complaint, among other things, charges the defendants with malicious interference with Nolen employment contracts, the enticing away of Nolen trade secrets and confidential matter, and unfair competition. The defendants deny the allegations of the complaint.

The court has reviewed the pleadings and the voluminous testimony taken in this cause. It appears from the testimony that Nolen has been engaged in the pest control and exterminating business in Dade County for over 10 years and is still engaged therein. Prior to incorporation the president, Truly Nolen, had been engaged in the business for over 11 years.

Nolen provides its services to residences, apartment buildings, hotels, restaurants, etc., through the use and medium of trained pest control service operators. The names, addresses and prices of the customers are not readily or easily ascertainable by competitors.

The Orkin organization, consisting of a parent and numerous corporate subsidiaries (such as the two defendants here in Florida) is in the pest control and exterminating business, operates on a nationwide basis and has several hundred branch offices. It is a rapidly expanding organization, opening new branch offices constantly in Florida. Florida requires pest control operators certified by the state for each branch. The officers of the defendant subsidiary corporations are the same officers as for the parent corporation, with main offices in Atlanta, Ga. Orkin maintains a large branch office in Miami, branches elsewhere in Dade County and in Monroe and Broward counties.

It appears from the testimony that the defendant Pierce had previously worked for Nolen as general manager, and was hired by Orkin to be general manager of Orkin's Tampa branch office. Pierce remained in Tampa for two years and was subsequently transferred to the Miami area, at which time the difficulties which arose in this case commenced. It is to be noted that Pierce was to be paid $3\frac{1}{2}\%$ of the total amount paid into the bank from customer collections.

Upon assuming his role as Orkin's Miami area manager, Pierce, acting in concert with Orkin, solicited for employment by Orkin in the Miami area and elsewhere, pest control service operators and key personnel of the Nolen firm.

Defendant Snyder had worked for Nolen on two previous occasions and on October 19, 1956 he entered into a written employment contract for a five year term commencing October 31, 1956. Snyder was employed as a supervising entomologist and he was to

perform among other duties, public speaking engagements, research, sales, prepare demonstrations and exhibits, etc. Snyder, during the five year term, agreed to devote his entire time and efforts to advance the Nolen interests and he was not to be engaged in any other commercial duties or pursuits in the exterminating or pest control field. The parties further agreed that Snyder was not to do any consulting or teaching in the field of entomology without Nolen's consent and that any research he did would be Nolen's property.

Snyder commenced working for Nolen under the contract and then sometime in September of 1957, without instigation on his part, Snyder was intentionally, deliberately and wilfully solicited and contacted by Pierce and one Russell, an Atlanta representative and "talent scout" for Orkin.

Pierce and Orkin, working in concert for their joint and several interests, sought to entice and take away from Nolen other Nolen employees, such as Ethel Darrow, assistant office manager and confidential secretary; Harry N. Iles, Jr., a Florida licensed pest control operator in charge of the Nolen termite division; Gene Churchill, credit manager and assistant to the Nolen president; Al Bonkenburg, route service supervisor in charge of the Miami Beach area for Nolen; and Henry Boerner, route serviceman. None of these persons requested Orkin employment and all were under either a written or oral contract of employment with Nolen.

Nolen had employed one Myron Milligan, a graduate entomologist, for approximately one year. Milligan had a Florida pest control certificate, which was being used by Nolen for a branch office in Homestead, Florida. Milligan was working for Nolen up to September, 1957, but in October, 1957, Milligan was employed (and using his pest control certificate) by Orkin, at Panama City, Florida, a new Orkin branch office. When Milligan was taken away by Orkin, Nolen was compelled to close down the Homestead office because a branch office cannot be maintained without a Florida pest control certificate in effect at the branch office. Milligan's leaving left Nolen without any entomologist.

Pierce made arrangements for Nolen employees to work for Orkin in areas other than in Dade County, Florida.

This court finds from the testimony that the defendant Snyder is a unique and irreplaceable individual. He is a graduate entomologist, master of science in entomology, major in three fields, biology, education and entomology, is a holder of on education degree from Pennsylvania State University. He was employed by Nolen to do research work and to train the pest control operators and service-

men. It appears that the morale of the Nolen employees was high during such time as Snyder was employed by the company and teaching and assisting the men. Nolen considered Snyder to be the most valuable man the company had ever employed, and after Orkin took Snyder away the morale of the Nolen employees was adversely affected. He prepared the Nolen employees for the Florida pest control examinations. He identified unknown insects. He prepared demonstrations and exhibits for the general public. He could solve the men's work problems. He held a Florida pest control certificate and his certificate was being utilized for a Nolen branch office. After Snyder was taken away from Nolen by Pierce and Orkin, his Florida pest control certificate was used and is being used by Orkin at its Hollywood, Florida branch office. Snyder conducts training programs for Orkin employees to enable them to pass the Florida pest control certificate examinations and to assist them in better servicing Orkin customers. The Orkin service improved tremendously. Orkin's technical education was in "bad shape" until Snyder began his teaching courses for the men. The Orkin employees testified that because of Snyder's unique teaching ability, Orkin now has a "new look." If Snyder were to leave Orkin, "it would be a terrific blow to them because the training which has been initiated by Bud [Snyder], is unique and may be the only one of its kind in the whole Orkin industry." (See Douglas Downes' testimony, tr. 863).

Snyder, by virtue of his employment contract and his position with the Nolen firm, became familiar with the methods, systems, techniques and formulas of Nolen and the names, addresses, prices of the Nolen customers and other secret and confidential information.

The court finds that Snyder, after he had entered into the five year agreement with Nolen, did not voluntarily seek employment with Orkin and would not have breached and abandoned his contract with Nolen had it not been for the defendants' conduct.

As a direct and proximate result of Orkin's actions in taking away Snyder, Milligan and Boerner—all Florida certified pest control operators—Nolen had to close down three branch offices and was unable to obtain qualified licensed personnel to replace the loss of the persons and licenses and keep the offices open. Nolen was unable to find anyone duly qualified to replace Snyder and it is interesting to note that when Nolen did employ one Douglas Downes, a graduate entomologist, after Snyder had been taken away by Orkin, the defendants Pierce and Orkin enticed and persuaded Downes to quit Nolen and work for Orkin. Although Orkin already had three entomologists in the Dade County area and

Nolen had none other than Downes, Downes was taken away by Orkin—another indication of the manner and method by which the defendants deliberately and intentionally interfered with the contractual relationship between Nolen and its employees. Orkin pirated and took away from Nolen, Pierce, Snyder, Milligan and Downes. It appears from the testimony that an entomologist is important to the operation of a pest control company.

The court, during the course of three hearings before it, has personally observed the demeanor of various witnesses and parties in this cause. Although there have been conflicts in the testimony, this court has resolved the conflicts—and the facts as stated in this final decree constitute the court's findings of fact.

With respect to the contention made by the defendants that Nolen was guilty of the same inequitable and unconscionable conduct, the court finds that such contention is without merit and not proven.

With respect to the contention that the five year agreement entered into between the defendant Snyder and the plaintiff was void and not supported by consideration, the court finds that there was adequate consideration for the contract and for the restrictive covenant contained therein.

This court finds that the certificate of stock of Nolen referred to in the contract was being held for defendant Snyder and that said certificate of stock was ready for delivery to Snyder upon his request at any time. Nolen was ready, willing and able in good faith to perform any and all of the acts required by it pursuant to the agreement and the court further finds that Snyder did not at any time demand performance by Nolen of the delivery of the certificate of stock referred to in the agreement. The court does find, however, that Snyder was entitled to receive the certificate of stock during the time of his employment with Nolen, or its value in money of $50—even though Snyder has refused to accept the certificate of stock, or money, which was tendered to him during the hearings held in this cause. Since Snyder is no longer in Nolen's employ, under the terms of the contract and the intention, custom and understanding of the parties, he is entitled to receive the sum of $50, the value of the stock certificate during the first year of the contract—Snyder commenced working under the contract on October 31, 1956, and was working for Orkin on October 7, 1957.

The evidence and testimony in this cause affirmatively shows malicious, wanton and unlawful interference by Orkin and Pierce with Nolen's employment contracts with its employees and with Nolen's pest control business. The malicious interference with the

plaintiff's employees was for the main purpose of harming the plaintiff's business, and the facts established in this case show a conspiracy for that purpose.

In the instant case, it is undisputed as shown by the testimony and exhibits that for the proper protection of a company such as Nolen or Orkin engaged in the pest control, exterminating, fumigating and termite control business, the business requires secrecy in connection with the methods and systems employed, and that for the proper protection of the company, it is absolutely necessary and essential that all matters connected with, arising out of, or pertaining to the business of the company, its methods and systems and the names of its customers, the addresses and prices, be kept secret and confidential. It is undisputed that by virtue of their employment, personnel learn the names, addresses and prices of customers of the employer within the territory worked by the employee, and the methods, systems, techniques, processes and formulas employed by the employer. The nature of the employer's business and the training received by the employees are of a confidential and secret nature and should not be disclosed or revealed to any competitor (see employment contracts entered into between Orkin and defendant Pierce and defendant Snyder, plaintiff's exhibits 12-A and 12-B). That is one of the reasons why restrictive covenants were included in Nolen employment contracts with its employees, and Orkin employment contracts with its employees. The contracts of employment used by Orkin in Florida are similar to the Orkin contracts used by the national Orkin organization—which Orkin has asked courts of other jurisdictions to enforce because of the confidential matter, trade secrets, etc.

In Orkin Exterminating Company of Arkansas v. Murrell (Ark. 1947), 206 S.W. 2d 185, the court held the Orkin contract of employment and its provisions thereof as to confidential matter, etc., to be valid and not in restraint of trade.

In Orkin Exterminating Co., Inc. v. Wilson (1946), 277 N.C. 96, 40 S.E. 2d 696, Orkin successfully obtained an injunction against one of its former employees violating a restrictive covenant contained in an employment contract, and the court said—"It is obvious that in the performance of his duties as such manager, the employee acquired an intimate knowledge of his employer's business, and had a personal association with his customers, which, when his employment terminated for any cause, *would enable the employee, if employed by a competitor of his employer, to injure the business of the latter.* We think the covenant is reasonable in its terms and not unreasonable in time or territory." (Italics added.)

In Orkin Exterminating Company v. O'Hanlon (N.C.), 91 S.E. 2d 222, page 230, the North Carolina court enjoined a competitor employing one of Orkin's former employees from aiding the former employee in violating his contract with Orkin. In that case Orkin, the plaintiff, relied on the statement in Sineath v. Katzis, 218 N.C. 740, 12 S.E. 2d 671, 681, which Orkin quoted in its brief, as follows —"However, a stranger to the covenant may properly be enjoined from aiding the covenantor in violating his covenant or receiving any benefit therefrom. Hence, a stranger to the covenant may well be enjoined from, in conjunction with the covenantor, or with his assistance, conducting a business with the covenantee."

The mere fact that one is engaged in a competing business and wishes to engage workmen for such business is not a legal excuse for enticing away the employees of another. A person is not justified under the guise of competition in actively and affirmatively inducing the breach of a competitor's contract in order to secure an economic advantage over the competitor. See Imperial Ice Co. v. Rossier (1941), 18 Cal. 2d 33, 112 P. 2d 631.

The basic rule in Florida for liability for interference is that one has the right to be secure in his contracts and to pursue his business relations or employment free from the interference of others, except where such others are acting in pursuance of some superior or equal right. Stated otherwise, one may not interfere in the contract, business or employment rights of another unless such interference is justified or constitutes an exercise of an absolute right. Interference which is not justified or does not constitute an exercise of an absolute right is generally held to be actionable as malicious in the legal sense. Actual malice, in the sense of ill will or spite, is not a prerequisite to such an action. In this case it is apparent to the court that even though Orkin and Pierce were aware of the existence of Snyder's five year contract with the plaintiff they knowingly, intentionally, wilfully, wrongfully and maliciously enticed and took Snyder away from Nolen, and the defendants still persist in retaining Snyder after knowledge of said contract and the fact that his services are due to Nolen until October 31, 1961. (Tr. 21, 50).

Nolen has proven and the court finds that Orkin and Pierce acted maliciously. To act maliciously, it does not necessarily mean that the defendants must act with actual ill will. Malice exists, for the purpose of the rule, in an intent to do something which, when done, operates to the detriment and injury of the employer. The scienter or knowledge on the part of a defendant of the existence of the contract of employment has been regarded by the courts as supplying the element of malicious or unlawful motivation necessary to make his act, in enticing the employee, a tort.

Knowledge of the existence of the contract is a condition of liability for procuring the breach, and the court finds that Orkin and Pierce did have actual knowledge of the existence of the Snyder and Boerner contracts, and acted intentionally without just cause or excuse. (Tr. 21, 50).

The Supreme Court of Florida has held in the leading case of Chipley v. Atkinson (1887), 1 So. 935, that an action lies against a person who has maliciously procured the employer to discharge an employee from employment providing damage resulted to the employee from such discharge. That case also held that an action will lie even though the period for which the employment is to continue is not certain and is terminable at pleasure, if damage results from the discharge, even though from inability to ascertain the amount of the damage, a verdict for nominal damages only will result.

In the Chipley case the employee was the party damaged—but the same principle of law applies in the instant case where the employer is damaged. Although it may be the legal right of the parties to the employment agreement to terminate it or refuse to perform it, it is not a legal right but a wrong on the part of a third person, such as Orkin or Pierce, to maliciously and wantonly procure one of the parties to the agreement to terminate or refuse to perform it. Such wanton and malicious interference for the purpose of injuring another is not the exercise of a legal right.

The Chipley case has been followed in this state since its inception, and in Dade Enterprises v. Wometco Theaters (Fla. 1935), 160 So. 209, it was held that a party to a contract, injured by a third person's malicious interference, can maintain an action against the third person and malice will be inferred where the third person's act was intentional. The case further held that an act which is calculated to and does in fact damage another in his property or trade, is actionable if done intentionally without just cause or excuse.

Injunctive relief against an attempted interference with a contract is proper even though the injured party has a remedy by action at law in case of breach, if that remedy is inadequate. See Montgomery Enterprises, Inc. v. Empire Theatre Co., 204 Ala. 566, 86 So. 880, 19 A.L.R. 987; E. L. Husting Co. v. Coca Cola Co., 205 Wis. 356, 237 N.W. 85, 84 A.L.R. 22, writ of cert. denied in 285 U.S. 538, 76 L. Ed. 931; Anderson v. Tower Amusement Co., 118 Fla. 437, 159 So. 782.

It is equally well settled that equity will intervene to prevent a third person from wrongfully inducing a breach of a contract of employment. Injunctive relief will be granted for such purpose

where the injury is otherwise irremediable and the legal remedy insufficient to compensate the claimant. Hitchman Coal and Coke Co. v. Mitchell, 245 U.S. 229, 62 L. Ed. 260, L.R.A. 1918 C 497; Stone v. Goss, 65 N.J. Eq. 756, 55 A. 736, 63 A.L.R. 344, 103 Am. St. Rep. 794 (involving an injunction against persons who knowingly induced an employee to disclose trade secrets in violation of his contract of employment).

In the instant case, it is evident that Nolen does not have an adequate remedy at law to prevent future malicious interference with its contractual relations with its employees. An injunction must and shall issue against the defendants.

Defendant Snyder's written agreement with the plaintiff contains a restrictive covenant provision which provides that—

"Upon the termination of his employment either by termination of this agreement by wrongful discharge or otherwise, Snyder shall not directly or indirectly, within Dade County, Florida, enter into or engage in the pest control business or any branch thereof either as an individual on his own account, or as a party, or as an employee, agent, or salesman for any person, or as an officer, director, stockholder, or otherwise, for a period of eighteen (18) months after the date of termination of his employment hereunder where, by virtue of such employment or business venture, he will be soliciting or servicing, either directly or indirectly, any of the persons, individuals, institutions, that he serviced or contacted or solicited while he was an employee of Nolen."

Despite the fact that Snyder's Florida pest control certificate is being utilized by Orkin in Hollywood, Florida, this court finds that Snyder is working in Miami and is exerting a direct influence on the pest control business for Orkin in Dade County, adversely to Nolen. (Tr. 45). Restrictive covenants of this type, in the best of circumstances, are difficult to enforce. If the covenantor wishes to avoid the agreement, the covenantee (Nolen, in this case) is required to become a policeman and a detective to catch him. When the covenantee is able to prove a breach, he finds it most difficult to prove, with the certainty required by law, the damages which he has suffered. For these reasons there are few types of contracts which require greater attention by the courts in their enforcement —and in so doing the moral obligation of the covenantor, the obligation to observe the spirit as well as the letter of the agreement, must be considered and enforced.

The rule of law as to damages in cases similar to the case at hand holds that the defendants are responsible for all the consequences growing out of their wrongful acts. It has also been said that the measure of damages for procuring breach of a contract is the loss

either of property or of personal benefit, which, except for such interference, the plaintiff would have been able to attain or enjoy, including such loss of profits as the plaintiff can prove to have resulted directly and proximately from the wrongful acts.

In actions for procuring breach of a contract, the plaintiff need not produce evidence of damages in any specific amount in order to recover damages in a substantial amount, it being sufficient for him to establish facts from which it properly may be inferred that some damage resulted to him from the interference. See 30 Am. Jur., "Interference", section 59, Damages, pp. 94, 95.

As regards the measure of damages recoverable by an employer against a third person, in this case the defendant Orkin corporations and Pierce, for the enticing away of Nolen's employees by the latter, it has been held that the employer is not limited to recovery for the loss of services, but is entitled to all damages resulting from the wrongful acts. The measure of damages for the enticing away of an employee who is hired by the year, is the direct loss legitimately incurred in endeavoring to replace the employee and the average net profits made by men of fair business capacity out of the labor of such an employee during the year for which he was hired. See 30 Am. Jur., Interference, section 61, pp. 95, 96.

At the time Snyder went to Orkin, he was engaged in a particular display project involving live insects at the Dupont Plaza Building in Miami. This project was not completed by Snyder and as a result, Nolen incurred actual expenses for transportation and compensation for a vacationing outside entomologist to attempt to complete the project. The cost as shown by checks admitted in evidence was $1,237.38 (plaintiff's exhibit no. 18), but the project was not completed. The $1,237.38 expense would not have been incurred by the plaintiff but for the abrupt enticing away of Snyder.

Truly Nolen, president of the plaintiff corporation, testified, and the court finds that the salaries of one Churchill and Bonkenburg had to be increased by Nolen after the two employees had been contacted and solicited by Orkin and promised "opportunities unlimited". Churchill received a $100 a month increase from Nolen after returning from an interview with the Orkin executives in Atlanta in July, 1956. Orkin solicited Churchill knowing that Churchill had an employment contract with Nolen. The increased salary to Churchill was a direct and proximate result of Orkin's malicious interference with Churchill's contract with Nolen. The expense to Nolen has been $100 a month for the period of time from July, 1956, to November, 1958, a period of 29 months, for a total of $2,900. (See Nolen's testimony of October 6, 1958, pp. 98-100).

Another Nolen employee, Bonkenburg, a pest control route supervisor contacted and solicited by Pierce for employment with Orkin shortly before the plaintiff's complaint was filed, had a written contract with Nolen. Pierce made arrangements for Bonkenburg to travel to Atlanta at Orkin's expense for an interview. In Atlanta, Bonkenburg told Orkin executives the nature of his duties with Nolen. Nolen had to increase Bonkenburg's salary $20 per month after his return from Atlanta. For two months, the actual increased expense is $40.

The testimony conclusively established that three of Nolen's six pest control branch offices in the Dade County area had to be closed when Nolen's Florida licensed pest control operators, Snyder, Milligan and Boerner, were enticed away from Nolen to work for Orkin. Orkin is now using the former Nolen employees' pest control licenses for Orkin branch offices in Hollywood, Panama City and Gainesville, Florida.

Nolen is still paying rent for the two branch offices on Biscayne Blvd. and is not able to utilize them for the pest control purposes for which they were originally rented. The Homestead branch office has been closed. The rent for the branch office at 741 Biscayne Blvd., Miami, was $2,500 a year and the lease will expire in two more years. The rent for the branch office at 7613 Biscayne Blvd., Miami, is $85 a month and the lease on said branch office does not expire for two and a half years. Nolen has attempted to mitigate both rents, but has only been able to rent the one office at 7613 Biscayne Blvd. for $50 a month, making a loss in damages to Nolen of $35 per month over the two year period, amounting to $1,050. Nolen was able, pursuant to the applicable laws relating to the operation of pest control branch offices, to keep the offices open for 90 days after Milligan, Boerner and Snyder left, but was unable to keep them open without a certified Florida pest control license listed for the branch office. Snyder was taken away from Nolen on October 5, 1957, and Nolen was compelled to discontinue the branch office at 741 Biscayne Blvd. within 90 days from that date, on January 5, 1958. The actual rental damage to Nolen for the closed branch office at 741 Biscayne Blvd., from January 5, 1958 to December 5, 1958, a period of 11 months at $208.33 per month, was $2,291.63.

The usual rules governing the award of exemplary damages generally in actions for damages based upon tortious acts are applicable to actions for damages for interference with another's contract rights, business relationship, or employment. Aggravated unjustified interference with contractual rights, in reckless disregard of the rights of the contracting parties—which generally means there

must be proof of facts tending to show actual malice—justifies the award of exemplary or punitive damages. It is well settled that punitive damages may be awarded by the courts against a person who maliciously induces an employer to discharge an employee, or are recoverable by an employer against anyone who knowingly, wilfully and maliciously entices away his employee. See 30 Am. Jur., Interference, section 83, p. 97.

In determining the amount of punitive or exemplary damages, the pecuniary circumstances of the defendant are to be considered as obviously what would be pecuniary punishment for a man of small means would not be felt as such by one of large means. Punitive or exemplary damages are awarded as punishment to a defendant and as a warning and example to deter him and others from committing similar offenses in the future.

It is undisputed that the Orkin firms are worth in excess of $20,000,000 and that from exhibits introduced by Orkin it is evident that Orkin Exterminating Company of South Florida, Inc. for the year ended October 31, 1957 had a total income of $1,659,979.14 with a net profit before income taxes of $194,823.43. The total income for the Miami exterminating branch of the defendant Orkin company for the 11 month period ending September 30, 1958 was over $423,000. The Miami branch is one of many branches operated by Orkin Exterminating Company of South Florida, Inc.

When some former employees of Orkin went into competition with Orkin elsewhere, the Orkin firm budgeted $150,000 to eliminate what they referred to as cutthroat competition.

It appears from the evidence presented in this cause that the Homestead branch office's monthly pest control sales volume was $1,000; that the 7613 Biscayne Blvd. branch office's monthly pest control sales volume was $2,500; that the 741 Biscayne Blvd. branch office's monthly pest control sales volume was $5,000; and that the total monthly pest control sales volume from the three branch offices which had to be closed down was $8,500 a month—a total of $102,000 per year.

It appears from the testimony presented in this cause that Pierce earns approximately $31,000 per year. Pierce's employment contract with Orkin made Pierce directly interested in increasing Orkin's business, as his salary was in direct relation to the increase in the bank deposit collections made by Orkin. It is evident that Pierce had an individual financial interest in the acts done to injure Nolen's business which acts directly increased the Orkin business and Pierce's compensation. Pierce was not under the normal con-

tract of a basic salary of a stipulated amount per week. Pierce wilfully and intentionally aided in committing the acts of interference with Nolen's employees, well knowing that it was not good, fair competition—"knowing everything he did about the customers, and everything".

In summary, the court finds—(1) That Snyder entered into a written contract of employment for a five year term commencing October 31, 1956, with Nolen. (2) That the defendants, Pierce and Orkin, acting maliciously, intentionally and wilfully, and without just cause or excuse, induced and enticed Snyder to breach and abandon his written contract of employment with Nolen. (3) That the contract would otherwise have been performed by Snyder had it not been for the malicious and wrongful acts of the defendants Pierce and Orkin, and that the acts of the same defendants were the moving cause of the breach. (4) That Snyder, in his employment, is a unique and irreplaceable individual. (5) That the certificate of Nolen stock was being held for Snyder, and that Nolen was ready, willing and able in good faith to perform all acts required by it pursuant to its agreement with Snyder, and that Snyder did not demand performance by Nolen of delivery of said stock as referred to in the agreement. (6) That Snyder is entitled to receive the value of said stock—$50. (7) That the methods and systems used in the pest control, exterminating, fumigating and termite control business, the names, addresses and prices of customers of a pest control, exterminating, fumigating and termite control business, and the training program within such business, are of a secret and confidential nature. (8) That the restrictive covenant provision in the five year agreement restricting Snyder as outlined therein for 18 months within the area of Dade County was reasonable, and was not against public policy, nor in restraint of trade. (9) That Nolen in good faith attempted to mitigate its damages. (10) That Pierce and Orkin maliciously, wantonly and wrongfully interfered with Nolen employment contracts with Darrow, Iles, Churchill, Bonkenburg, Levitt and Snyder. (11) That the actual damages suffered by Nolen as a direct and proximate result of the actions of Pierce and Orkin is the sum of $7,519.01. (12) That the plaintiff is entitled under the law to recover exemplary and punitive damages from the defendants Pierce and Orkin.

It is, upon due consideration, ordered, adjudged and decreed as follows—

1. That this court has jurisdiction of the subject matter hereof and of the parties hereto, and that the equities of this cause are with the plaintiff.

2. That the defendant, Albert Snyder, be and he is hereby enjoined and restrained for a period up to and including March 5, 1959, from directly or indirectly, within the Dade County area, entering or engaging in the pest control business or any branch thereof, either as an individual on his own account or as a party or as an employee, agent or salesman for any person, or as an officer, director, stockholder or otherwise, and he is further enjoined for said period from soliciting or servicing either directly or indirectly, any of the persons, individuals or institutions that he serviced or contacted or solicited while he was in the employ of the plaintiff, Truly Nolen, Inc.

3. That the defendant, Taft Pierce, and all persons acting in conspiracy with him, be and they are hereby permanently enjoined from wilfully and wantonly enticing away the plaintiff's employees and maliciously interfering with the employment contracts between the plaintiff and the plaintiff's employees.

4. That the defendants, Orkin Exterminating Company of South Florida, Inc., and Orkin Exterminating Company of Florida, Inc., their officers, agents, employees, and all persons acting in conspiracy with them, be and they are hereby permanently enjoined from wilfully and wantonly enticing away the plaintiff's employees and from maliciously interfering with the employment contracts between the plaintiff and the plaintiff's employees.

5. That the said defendants, Taft Pierce, Orkin Exterminating Company of South Florida, Inc., and Orkin Exterminating Company of Florida, Inc., be and they are hereby enjoined and restrained from directly or indirectly aiding and assisting the defendant, Albert Snyder, from breaching and violating his restrictive covenant of employment with Truly Nolen, Inc., as hereinabove set forth.

6. That the plaintiff, Truly Nolen, Inc., shall have and recover from the defendants, Orkin Exterminating Company of South Florida, Inc., Orkin Exterminating Company of Florida, Inc., and Taft Pierce, the sum of $7,519.01, as actual damages, for which sum let execution issue forthwith.

7. That the plaintiff, Truly Nolen, Inc., shall have and recover from the defendant Taft Pierce, the sum of $7,500, as punitive and exemplary damages, for which sum let execution issue forthwith.

8. That the plaintiff, Truly Nolen, Inc., shall have and recover from the defendants, Orkin Exterminating Company of South Florida, Inc., and Orkin Exterminating Company of Florida, Inc., the sum of $75,000 as punitive and exemplary damages, for which sum let execution issue forthwith.

9. That the plaintiff, Truly Nolen, Inc., shall pay to defendant, Albert Snyder, within five days from the date hereof, the sum of $50, the stipulated value of the one certificate of stock referred to in this decree.

10. That the costs of these proceedings are taxed against the defendants.

11. That this court retains jurisdiction for the purpose of enforcing the terms and conditions of this decree.